476 A.2d 374

**COMMONWEALTH of Pennsylvania**

v.

**James WHYATT, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 18, 1983.

Filed April 6, 1984.

494

Eliot Harvey Lewis, Philadelphia, for appellant.

Jane Cutler Greenspan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before McEWEN, HESTER and LIPEZ, JJ.

HESTER, Judge:

Appellant, James Whyatt, was convicted by a jury of solicitation to commit sodomy, forcible rape, burglary and aggravated robbery. The convictions resulted from appellant's participation with others on March 14, 1973 in the unauthorized entry into the apartment of the victim, the use of deadly weapons to remove personal property therefrom, the gang rape of the victim and the commission of certain grotesque acts of involuntary deviate sexual intercourse with the victim. The victim was three (3) months pregnant at the time.

Following conviction, appellant was sentenced to consecutive terms of imprisonment on each bill, resulting in a combined term of twenty-seven and one-half (27½) to fifty-five (55) years. On appeal from the judgment of sentence, this court affirmed at *Commonwealth v. Whyatt*, 235 Pa. Super. 211, 340 A.2d 871 (1975). Appellant's subsequent petition for allowance of appeal was denied by the Pennsylvania Supreme Court on November 7, 1975.

Appellant comes before us again on appeal from the lower court's denial of his petition for post conviction relief. Appellant alleges several instances of ineffectiveness of trial counsel as grounds for either discharge or a new trial.

Prior to addressing each of trial counsel's alleged instances of ineffectiveness, we set forth the standard which controls once a counsel's effectiveness is placed at

issue. Of course, the Pennsylvania Supreme Court, in *Commonwealth ex. rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967), constructed the course repeatedly followed by our courts in reviewing ineffectiveness claims:

We cannot emphasize strongly enough, however, that our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis.

*Id.,* 427 Pa. at 604–605, 235 A.2d at 352

Furthermore, ineffectiveness occurs only where the alternative not selected "offered a potential for success substantially greater than the tactics actually utilized." *Id.,* 427 Pa. at 605, 235 A.2d at 353, Note 8; *Commonwealth v. Badger,* 482 Pa. 240, 393 A.2d 642 (1978).

First, appellant complains that trial counsel did not competently construct an alibi defense. Mrs. Hortense McAlister was the primary defense witness and accounted for most of appellant's actions on the day of the crime. She first related how appellant, her husband Arthur and her uncle from North Carolina arrived at her house around noon that day. The three men departed soon thereafter but returned together at 2:00 p.m. Prior to the men's return to Mrs. McAlister's house, Mrs. McAlister's sister-in-law, daughter Gloria and grandchild arrived. Then, the entire group departed Mrs. McAlister's house around 3:30 p.m. or 4:00 p.m. to visit her uncle's family. Her uncle, Harold Frank, and others from North Carolina were visiting relatives in Philadelphia.

The group traveled to Mrs. McAlister's sister-in-law's house, to another residence on 24th Street and then Mrs. McAlister, her husband Arthur, her twelve-year-old son, her

daughter Gloria and appellant returned to Mrs. McAlister's residence where the excursion originated. At 11:00 p.m., Mrs. McAlister prepared supper while the others, including appellant, watched television on the first floor. From 11:00 p.m. on March 14, 1973 until 3:00 a.m. on March 15, 1973, Mrs. McAlister was not continually in appellant's presence. During that period appellant watched television with Gloria while Mrs. McAlister traversed from the kitchen to the television room. Each time she arrived in the television room, she observed appellant sitting with her daughter. The crime was committed between 10:00 p.m. and 11:00 p.m. on March 14, 1973.

Appellant points out that only Mrs. McAlister and her daughter Gloria were interviewed by counsel. At the post conviction hearing, counsel was asked why he failed to interview Mrs. McAlister's husband, Arthur McAlister. Counsel explained that Arthur was subpoenaed to appear in court on August 27, 1973, the pre-trial date for appellant's Motion to Suppress. Arthur McAlister was unable to appear on that date due to his in-patient status at a Philadelphia hospital. Furthermore, according to counsel, neither he nor another attorney from the Philadelphia Defender's Association interviewed Arthur prior to that date or at anytime thereafter. Mr. McAlister remained unavailable during both the pre-trial and trial periods due to this illness which required longstanding hospitalization.

Other potential alibi witnesses were Mrs. McAlister's twelve-year-old son and her relatives from North Carolina. Counsel chose not to interview and call the son due to his belief that the child's tender years would damage his credibility and diminish his value as a defense witness. Counsel explained that the North Carolina alibi witnesses were never within his control as a result of their nonresident status.

Notwithstanding the defense value of each alibi witness, appellant is of the opinion that counsel's mere failure to interview Arthur McAlister, his twelve-year-old son and the North Carolina relatives was ineffectiveness in itself. Ap-

pellant directs our attention here to three Pennsylvania decisions holding trial counsel ineffective for neglecting to interview potential defense witnesses. In *Commonwealth v. Adams*, 465 Pa. 314, 350 A.2d 412 (1976), our Pennsylvania Supreme Court granted a new trial due to trial counsel's failure to interview a witness capable of corroborating defendant's contention that he fabricated a confession only to relieve himself of the physical beatings inflicted upon him by interrogating detectives. According to the *Adams* Court, ineffectiveness was demonstrated by the fact that "no conceivable trial strategy would have warranted the failure to introduce available evidence corroborating appellant's testimony about the alleged police beatings." *Id.*, 465 Pa. at 322, 350 A.2d at 416. Moreover, the *Adams* Court noted that corroborating witnesses are particularly important where, as in that matter, the defendant's testimony is measured against the contradictory testimony of Commonwealth witnesses.

Once again, as appellant correctly points out, our Pennsylvania Supreme Court, in *Commonwealth v. Mabie*, 467 Pa. 464, 359 A.2d 369 (1976), found ineffectiveness where trial counsel failed to interview potential corroborating witnesses. It was immaterial that counsel chose not to conduct an interview because he believed that the potential witnesses were hostile. As the *Mabie* Court explained:

However hostile these witnesses may have appeared to be, there is no basis for the decision neither to interview them nor to attempt to do so. While hostile witnesses at trial may have presented added difficulties to appellant's case, the question here is the decision not to interview them, not the decision to refrain from calling them at trial. Accordingly, there was no danger of hostile witnesses inflaming a jury during an interview to determine what each saw and their degree of potential hostility. *Id.*, 467 Pa. at 475, 359 A.2d at 374.

Finally, in *Commonwealth v. Williams*, 273 Pa.Super. 147, 416 A.2d 1132 (1979), trial counsel did not interview witnesses because he believed that their testimony would be

adverse to the defense. In following the Pennsylvania Supreme Court in *Mabie,* the *Williams* Court was unimpressed with the harmless consequences of counsel's failure to interview.

■ We agree with appellant insofar as recognizing that. a counsel's failure to interview potential defense witnesses may constitute ineffectiveness. However, *Adams, Mabie* and *Williams* did not hold that the failure to interview prospective defense witnesses is per se ineffectiveness. Indeed, this court in *Commonwealth v. Barren,* 273 Pa.Super. 492, 417 A.2d 1156 (1979), interpreted the *Mabie* decision accordingly:

> [Mabie] should not be indiscriminately expanded to require defense counsel upon the threat of being declared ineffective, to interview all conceivable witnesses irrespective of the nature or extent of the potential information. Trial counsel's failure to interview potential witnesses will not be equated with ineffective assistance in the absence of a showing that his or her testimony would have advanced the fact finding process. *Id.,* 273 Pa.Superior Ct. at 498–499, 417 A.2d at 1159, citing *Commonwealth ex rel. Washington v. Maroney,* and *Commonwealth v. Yarbough,* 248 Pa.Super. 356, 375 A.2d 135 (1977); overruled on unrelated grounds, 501 Pa. 493, 462 A.2d 233 (1983).

*Barren,* then, qualifies and refines the decisions in *Adams, Mabie* and *Williams* by espousing the proposition that there must be some showing that the witnesses not interviewed were equipped with information which might expand the admissible evidence.

In *Commonwealth v. Rainey,* 282 Pa.Super. 15, 422 A.2d 652 (1980), in relying on *Barren's* interpretation of the aforementioned cases, this Court declined to hold trial counsel ineffective for choosing not to interview prospective witnesses whose testimony was neither exculpatory nor probative. See also *Commonwealth v. Womack,* 307 Pa. Super. 396, 453 A.2d 642 (1982) for a demonstration of the

need to show the usefulness of a pre-trial interview prior to finding ineffectiveness for failure to conduct said interview.

■ Here, counsel did not interview Hortense McAlister's twelve-year-old son due to his belief that the child's minority tarnished his credibility. Arthur McAlister's interview was never conducted, according to counsel, because of Mr. McAlister's lengthy and serious illness throughout the lower court proceedings. Finally, the unavailability of the remaining prospective alibi witnesses, who were residents of North Carolina, made their interview impractical and burdensome. We recognize, of course, that the difficulty alone in arranging an interview of nonresident witnesses may not justify foregoing use of their testimony at trial; nevertheless, there were additional grounds here which warrant consideration and preclude a finding of ineffectiveness.

■ First, counsel believed that the testimony of Arthur McAlister, his twelve-year-old son and nonresident relatives was cumulative to the testimony of Hortense McAlister, the sole alibi witness presented at trial. According to counsel, Hortense would account for appellant's actions over a continuous period from 2:00 p.m. until 11:00 p.m. on the day of the crime. This period included the critical period from 10:00 p.m. to 11:00 p.m., the hour during which the victim was sexually abused and robbed and her apartment ransacked. Although Mrs. McAlister was not continuously within appellant's presence from 11:00 p.m. until 2:00 a.m. (March 14th to March 15th), counsel did not consider that a critical or dispositive fact. First, the crime was completed prior to appellant no longer being in Mrs. McAlister's continuous presence. Secondly, although Mrs. McAlister was not with appellant during every moment of the three-hour period from 11:00 p.m. to 2:00 a.m., she was convinced that he never left her residence. She explained that she was intermittently in his presence during that period as she entered the television room during respites from domestic chores. Insofar as the uncalled alibi witnesses could offer only cumulative testimony, counsel's decision not to inter-

view all prospective alibi witnesses, then, did have a reasonable basis toward furthering his client's interest. More importantly, appellant offers no explanation of how the excluded witnesses could have contributed to the evidence introduced at trial.

■ Appellant's second allegation of ineffectiveness is counsel's failure to call the aforementioned uninterviewed witnesses and Gloria McAlister for trial. Counsel's basis for not interviewing the aforementioned alibi witnesses similarly applies to his decision not to call them and Gloria McAlister for trial. We are compelled, however, to address an additional argument raised by appellant. Appellant makes much ado of this court's opinion at *Commonwealth v. Whyatt,* supra, wherein we sanctioned the lower court's charge allowing the jury to draw an adverse inference from the fact that counsel did not call the aforementioned prospective alibi witnesses for trial. In that appeal from the judgment of sentence, we affirmed the lower court's finding that there were gaps in Hortense McAlister's testimony which could have been filled by those witnesses not called; therefore, the excluded witnesses' testimony was not cumulative. Where there are witnesses completely in control of one party whose testimony would not merely be cumulative to the testimony of witnesses utilized at trial, and these witnesses are not called to testify at trial, then the jury can infer that those witnesses would offer testimony adverse to that party's case. *Commonwealth v. Jones,* 455 Pa. 488, 317 A.2d 233 (1974).

Appellant contends, therefore, that counsel was not justified in excluding Arthur McAlister, his twelve-year-old son, the North Carolina residents and Gloria McAlister as witnesses on the basis that their testimony was merely cumulative. After all, as appellant correctly points out, the lower court, whose judgment of sentence was affirmed by this Court, allowed an adverse inference charge on grounds that the testimony of these excluded witnesses was indeed not cumulative.

■ Although this argument appears formidable, we do not consider it relevant to this appeal from the denial of post conviction relief. It is *counsel's* belief which dictates the disposition of an ineffectiveness claim. Counsel testified at the post conviction hearing that he disagreed with both the lower court and this Court's opinion that the testimony of the excluded witnesses could fill the gaps in Hortense McAlister's testimony. Counsel agreed that there was a period *following* the crime during which appellant and Hortense were not in each other's company; however, for most of the day and throughout the entire period during which the crime was committed, counsel asserted that Hortense could account for appellant's every movement. This was counsel's position throughout the lower court proceedings. Nothing in the record indicates that at the *time of trial* counsel was unreasonable in assuming this position. It is inappropriate in this review of a claim of ineffectiveness to consider the trial court's adverse inference charge and this Court's affirmance of the judgment of sentence as evidence supplanting counsel's basis for excluding certain alibi witnesses. To do so would be an improper application of hindsight, a tool unavailable to counsel at trial. Additionally, counsel's decision not to call Gloria McAlister was further predicated upon his analysis of her demeanor, appearance, relationship with appellant and testimony itself. Counsel testified at the post conviction hearing that he routinely considered these factors in deciding whether to call a witness. We conclude, therefore, that counsel did have a reasonable basis for not calling these witnesses for trial.

■ For those reasons enumerated above, we also reject appellant's argument that counsel was ineffective for failing to give proper notice to the Commonwealth of potential alibi witnesses Arthur McAlister, his twelve-year-old son and the North Carolina residents. (Counsel did notify the prosecution of potential alibi witnesses Hortense McAlister and Gloria McAlister). Counsel had a reasonable basis for concluding that these witnesses could offer testimony which

was strictly cumulative in nature; therefore, he could reasonably believe that not to notify the prosecution of their role in the defense would not precipitate an adverse inference charge.

Appellant also contends that counsel was ineffective in failing to prepare for cross examination of Artie Simpson, appellant's accomplice who testified for the prosecution. The prosecutor notified counsel prior to trial that Artie Simpson would be presented as a Commonwealth witness. Counsel did not believe Artie would testify despite this notice. This belief was premised upon the fact that counsel's perusal of the visitor registration book, at the prison where Artie Simpson was detained, did not contain the signature of the prosecutor. Consequently, it appeared to counsel that Mr. Simpson was never interviewed by the prosecution. Also, counsel testified that Mr. Simpson informed him that he would not testify and that appellant was innocent. This belief was counsel's basis for not preparing alternative counsel for trial; he did not expect to withdraw as counsel in order to present himself as an impeachment witness.

At trial, when Mr. Simpson was presented as a prosecution witness, counsel sought permission to testify against Mr. Simpson. Counsel intended to remain as counsel, yet to temporarily withdraw to serve as a witness for impeachment purposes only. When the court granted permission for counsel to testify, providing he withdrew completely from the case, counsel opted not to offer himself as an impeachment witness. Counsel testified at the post conviction hearing that he believed the danger of calling an unprepared replacement counsel outweighed his need to testify as an impeachment witness. Counsel also explained why he did not aggressively attack Mr. Simpson's credibility on cross examination:

Q. In that case did you consider cross-examining Artie Simpson as to his prior inconsistent statements?

A. Yes.

Q. Did you cross-examine him?

A. To a very small portion.

Q. Why didn't you cross-examine him extensively on the subject?

A. Basically because I was concerned as to why he changed his testimony. You must remember the District Attorney's office has essentially said or told the world that there were no promises or threats made to Mr. Simpson to testify. Mr. Simpson was in the cell room in the same same block that Mr. Whyatt was in when I interviewed him. My client had informed me beforehand that Mr. Simpson was not going to testify and that he had admitted that Mr. Whyatt was not with him and when I interviewed Mr. Simpson he told me the same things. I was concerned that Simpson's statement in front of the jury may have been he was threatened by Mr. Whyatt and that is the reason why he told me a lie. I wasn't going to touch that without knowing what the answer was so I didn't do it. If he came out with that, I figure I was down the drain and so was Mr. Whyatt in front of the jury so I did not go into that and that's the reason I felt that a mistrial should have been granted. (N.T.P.C. H.A., pp. 48–49, November 5, 1980)

█ Appellant maintains, however, that irrespective of the basis for counsel's disbelief that Mr. Simpson would appear as a prosecution witness, and irrespective of the grounds for his tentative cross examination, counsel was nevertheless ineffective for not asking appellant himself whether he had threatened Mr. Simpson. Whether appellant had actually threatened him is irrelevant. Counsel was concerned, and reasonably so, with whether Mr. Simpson would testify that appellant's threats encouraged him to inform counsel that appellant was innocent and that he would not serve as a prosecution witness. Fear of what Mr. Simpson would relate on cross examination would not necessarily be assuaged by appellant's denial of having threatened him. Therefore, to question appellant would be a meaningless gesture, the nonpursuit of which cannot be deemed ineffectiveness.

■ Next, appellant asserts that counsel's trial tactics were abrasive and offensive, thereby degrading appellant's position in the jurors' minds. Appellant draws our attention to counsel's displeasure, expressed in facial contortions directed to the jury, with several of the court's rulings during trial. On one occasion, counsel responded to a ruling with: "You have got to be kidding me." We do not endorse such behavior, nor do we make light of it. It was obviously severe enough to prompt reprimands from the bench, outside the jury's presence. Counsel explained his strategy in employing such behavior at the post conviction hearing:

A. Mr. Lewis, I believe in front of the jury anything that can get your impression to that jury is important when you're representing a person and if the impression I wanted to give to that jury was absolute and utter disgust that I was having, I thought that was important, I would do it. I don't, however, agree that all of the things that Judge Ribner said were correct.

Q. You mean his ruling or his descriptions of what you were doing?

A. His descriptions of what I was doing. I believe if his descriptions were accurate, I would have been held in contempt. There are subtle ways of doing the things he suggested I did and I would suggest to you that I probably took the subtle approach or I would have been held in contempt.

(N.T.P.C.H.A., pp. 51–52, November 5, 1980).

Due to the fact that counsel genuinely believed that this particular jury would respond positively to his gestures of displeasure, we cannot conclude that such strategy had no reasonable basis designed to promote appellant's case.

■ Finally, appellant contends that counsel was ineffective for failing to investigate whether the testimony of Artie Simpson was coerced by the prosecution. According to appellant, his counsel at sentencing, Thomas Branca, made a notation in the file that he believed that Simpson was pressured by the Commonwealth into testifying against

appellant. This notation followed Mr. Branca's conversation with an assistant district attorney who handled the prosecution at the pre-trial and post-trial stages.

This contention is devoid of merit. First, appellant does not demonstrate that this information was available to counsel at the time of the lower court proceedings prior to sentencing. Secondly, at the conclusion of the post conviction hearing on February 11, 1981, the trial prosecutor stipulated for the record that he was not under the impression that Mr. Simpson was compelled to testify, that no one in fact compelled him to testify and that he had no reason to believe that he was compelled to testify. Therefore, it confounds logic to attribute to counsel the knowledge or the reason to know that Mr. Simpson was coerced into testifying for the prosecution.

Order denying the petition for post conviction relief is affirmed.